**Agnese R. Cowles et al., Appellants, v. Morris & Company et al., Appellees.**

**Gen. No. 30,420.**

1. CORPORATIONS—*liability under contract as affected by unauthorized representations of officers concerning same.* Expressions of opinion by officers of a corporation, not shown to have been authorized by it, cannot bind it to support a pension fund established by it in cooperation with its employees, farther than the rules of such fund provide.

2. CONTRACTS—*nonimplication of agreement unnecessary to full performance of express undertaking.* No implication of an agreement by a party to a contract, to perform acts other than those expressly stated therein, can be predicated upon the ground that a provision to that effect would have been included had it not been mutually assumed that its insertion was unnecessary, unless nonperformance of such implied agreement would incapacitate such party from performing its express undertaking under the contract.

3. CONTRACTS—*nonimplication of undertaking inconsistent with express terms of contract.* No implied agreement arises that a corporation will insure continuance of a pension fund when rules governing same were repugnant to such implication.

4. MASTER AND SERVANT—*rule of pension fund providing life pension for retiring employees as importing undertaking by employer to insure perpetuation of fund.* Rule of a pension fund, established by a corporation in cooperation with its employees, providing a life pension for employees meeting certain qualifications of age and service, held based upon an assumed continuance of the fund and not to import an obligation of the corporation to insure its continuance out of its own assets, in view of another rule expressly negativing such obligation.

5. MASTER AND SERVANT—*rule of pension fund prohibiting pensioners from accepting other employment as importing agreement by employer to insure perpetuation of fund.* Rule of pension fund, established by corporation in cooperation with its employees, prohibiting pensioners from accepting other employment without permission of pension committee, held not to import an obligation on the part of the corporation to insure the perpetuation of the fund until the claims of such pensioners were paid, where such implication was negatived by other rules of the fund.

6. MASTER AND SERVANT—*inequalities in pension benefits resulting from premature exhaustion of fund as risk incident to contract.* That some pensioners might draw a greater proportion than others of a pension fund before termination of contributions thereto by sale of founding company, was a risk incident to the contract.

7. MASTER AND SERVANT—*when employees' pension fund not deemed "deferred wage."* Pension fund, partly formed from employees' contributions, held not to constitute a "deferred wage," where employer paid the standard wage for similar labor and participation in fund was a condition of employment.

8. MASTER AND SERVANT—*employees' contributions to pension fund held to rest wholly upon express terms of agreement establishing same.* Contributions by employee to pension fund, when employer had not agreed to continue employment or contributions to the fund, are based wholly on the express terms of the fund contract, not on implied considerations.

9. MASTER AND SERVANT—*pension fund rules and regulations held to express entire agreement of parties.* Rules and regulations under which employees' pension fund established by employer in cooperation with employees was founded and administered held a complete contract, free from ambiguity or implication of omitted promises contemplated by parties as essential to fulfillment.

10. Master and servant—*sufficiency of evidence to show full performance by employer of terms of employees' pension fund agreement.* Evidence held to show employer had fully performed agreement under which employees' pension fund was established.

11. Contracts—*limitation upon right to acquire or dispose of property.* One is free to dispose of his property or acquire that of others on such terms as desired if no rule of law, good morals or public policy is violated.

12. Master and servant—*right to condition employment upon participation in employees' pension fund.* Compelling employees on employment by the corporation which bought the rights of their former employer, to put withdrawals from pension fund of the old concern into the new, is within the right of contract.

13. Master and servant—*servant's pension right inchoate.* The right of an employee to a pension is inchoate until happening of the contingency on which it was to be allowed.

14. Master and servant—*right of employees to withdraw contributions to pension fund although withdrawal prevented continuance of pensions payable thereon under rules.* Contract of a pension fund giving right of withdrawal of individual contributions to the fund authorized some employees to withdraw their contributions and put them in a new pension fund of the company buying the one which founded the fund, though such acts made impossible further payments of pensions to employees entitled thereto under the rules governing the fund.

15. Master and servant—*when beneficiaries of employees' pension fund not entitled to attack as creditors sale of employer's property.* When an employer, founding a pension fund, in cooperation with its employees, has fully performed its agreement in respect thereof, pensioners under such fund cannot claim the status of creditors of the employer and as such attack a sale of its property as in fraud of their rights, under the Bulk Sales Law, although such sale entails the destruction of the fund and the termination of pension payable under its rules.

16. Master and servant—*vested rights of beneficiaries of employees' pension fund subject to right of withdrawal by other employees.* Vested rights of pensioners in an employees' pension fund are subject to the right of other contributors to withdraw contributions under the rules of the fund.

17. Master and servant—*master founding pension fund not liable thereto beyond rules in absence of control of or conspiracy with committee in charge of fund.* Committee in charge of a pension fund, acting under the rules of the fund, without showing of fraudulent conspiracy with the employing company founding the

fund or control by it, cannot be held its agents so as bind it to continue contributions to the fund beyond the fund's rules.

18. HARMLESS AND PREJUDICIAL ERROR—*when complainants not prejudiced by order requiring joinder of additional parties.* Joinder of many other complainants on the court's order when the theory of the action and rights of original complainants were not affected, was without prejudice to complainants.

Appeal by plaintiffs from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1925. Affirmed. Opinion filed December 21, 1926.

C. W. ARMSTRONG, RUFUS M. POTTS, VERNE D. ED-WARDS and THOMAS HACKNEY, for appellants.

JOHN M. LEE, M. W. BORDERS, CHARLES J. FAULKNER, JR., and WALTER C. KIRK, for appellees.

MR. JUSTICE BARNES delivered the opinion of the court.

This is an appeal from a decree dismissing a bill for want of equity.

It is a class suit brought by pensioners under ''The Morris & Company Pension Fund,'' devised and established by that company for the benefit of certain of its employees to be operated and administered under certain rules and regulations by which the employees becoming contributors to the fund agreed to be bound. The gist of the controversy is as to the nature and extent of the contractual relations thus established between the company and said employees.

Under the averments of the bill the defendants are naturally divided into four groups: (1) The Morris & Company group, consisting of that company by that name and the name it took after the sale of its business and physical assets in 1923, and two of its officers; (2) the Armour & Company group consisting of the Illinois corporation of that name, two of its officers,

two affiliated foreign corporations of the same name, and The North American Provision Company, to which said sale was made; (3) the members of the committee administering the fund, and (4) certain defendants either dismissed out of the case or not served, whose interests are not before us.

The hearing was before the chancellor upon the issues raised by the answers of the several groups to the bill as amended, and replications to the answers. The bill is so voluminous, repetitious and argumentative that it is impracticable and unnecessary to state more than its theories and the essential admitted and evidentiary facts on which they are predicated.

On January 1, 1909, Morris & Company, then engaged in meat packing and kindred industries, inaugurated and put into effect a pension fund, denominated "The Morris & Company Pension Fund," for the officers and certain employees of said company and affiliated companies. The plan was embodied in certain rules and regulations for raising, managing and paying out the fund, drawn up at the instance of Edward Morris, the president of the company, and submitted to each of the company's employees then eligible to membership under the terms of the document. Such of them as wished to avail themselves of its provisions signed the form of application prescribed therein, and agreeing to be bound thereby became contributors to and participants in the fund. By its terms the company was to contribute $25,000 annually until the fund equalled $500,000, and its agreement in this respect was carried out. It subsequently made donations to the fund, the entire contributions of said company, its subsidiaries and Edward Morris, aggregating $1,249,966. Said employees, except those receiving a salary of $10 or less per week, were to contribute three per cent of their salaries. At the time of the sale, those members of the fund who had not been placed on pension had contributed $916,352.27,

and the pensioners, including those whose pension had terminated, $131,968.79, and the fund had earned from investments nearly a half-million dollars. The rules prescribed to whom the fund was applicable, the ratio of their contributions thereto from their weekly or monthly pay, the conditions of eligibility to a pension allowance, and the rate thereof. They vested full and complete administration of the fund in a committee composed of two members named by the company and three members elected by the employees contributing to the fund. A majority of them were to govern and were given power to annul, alter, add to or amend any of the rules. The rules did not contemplate any control or direction by the company or other contributors over the committee or the fund.

After the sale of the physical assets and business of Morris & Company to the Armour interests, many of its employees, including some who were entitled to a pension, drew out their contributions to the fund, with interest thereon, as provided for by the rules, and accepted an offer of Armour & Company to enter its employ on condition that they contribute to a like fund for the employees of that company under requirements for back payments to put them on an equality with other members of the latter fund. Their withdrawals from the fund depleted it to about $320,000, an amount sufficient to continue monthly disbursements to those on pension at the then rate for only about 14 months, after which time the payments would have to be discontinued owing to the lack of funds. There were about 400 pensioners, 20 of whom filed this bill. By order of court the others were also made parties complainant.

The bill sets forth said rules and regulations in full as originally in force and as subsequently amended, the facts above stated in substance and certain evidentiary facts that need not be repeated.

Upon the facts alleged are predicated the following theories: (1) That Morris & Company "breached its contract of employment and implied contracts" between it and the contributors to the fund and pensioners thereof; (2) that it owed them a duty and obligation "to continue to operate or so to operate its said business as to insure the continuation and operation of said pension fund and payment in full for the full time promised * * * or in lieu thereof the duty and obligation of otherwise providing for the payment in full and for the full time promised of said pensions, benefits and annuities"; (3) that complainants have vested rights and interests in said fund as against mere members thereof and are entitled to have moneys so paid out to the latter returned to the fund; (4) that Armour & Company and its allied corporations and officers, and also the pension committee, "maliciously interfered in and intruded upon the rights of the complainants," thereby inducing said Morris & Company to breach its contracts with them, and that the property of Morris & Company purchased by Armour & Company was subject to pensioners' claims; (5) that the several defendants entered into a scheme and conspiracy whereby the business and physical assets of Morris & Company, so subject to pensioners' claims, should be taken over by the Armour interests free from any lien or charge of any claim or right of said pensioners, so the Morris & Company Pension Fund should cease to function; (6) that the pensioners are creditors, and as to them the sale was void under the Bulk Sales Law [Cahill's St. ch. 121a, ¶¶ 1-3]. The bill seeks relief in line with these theories; discovery relating to the terms of the contract of sale, an accounting by the several defendants of the disposition of the pension fund and alleged dissipation thereof, an injunction to prevent stopping or delaying monthly payments to pensioners, and such other relief, etc.

Much of complainants' evidence was offered to sustain its theory and contention that the rules and regulations did not embody the sole contract between Morris & Company and its employees, but that there were supplementary agreements amendatory thereof. They were permitted to introduce evidence of casual conversations or remarks, expressions in letters and speeches by agents and officers of Morris & Company that might induce confidence or belief of the employees that their pensions were assured for life and that Morris & Company with its "millions" stood back of said assurances. These statements were received in evidence upon the understanding that they would subsequently be connected with proof of their authorization. While many of the alleged statements were denied by the persons to whom they were attributed, nevertheless complainants failed to prove their authorization. At best, as held by the chancellor, they constituted mere expressions of opinion, and neither added to nor modified the company's contractual obligations as established by the rules and regulations. This is so obvious that we may summarily dismiss such statements from consideration or review as unauthorized and immaterial. Without such evidence there is no basis for the theory of supplemental agreements, and appellants do not undertake to argue that the chancellor's findings are against the weight of the evidence relating to these matters even if admissible.

The entire case, therefore, must rest on a proper construction of the rules and regulations as embodying the complete contract. We need not recite them at length. Only a few of the rules need to be alluded to. Looking to their various provisions we find no room for any of the theories upon which the bill is predicated. Under them, all that Morris & Company was obligated to do was to contribute to the fund $25,000 annually until it reached $500,000, and appoint its representatives on the committee. All this it did,

and much more that was entirely gratuitous, whether prompted by self interest or philanthropic motives, as is conceded. In fact the alleged breach of contract is predicated, not on the omission to perform any express agreement, but mainly upon an implied agreement and duty of the company to continue to operate its business so as to insure and assure the continuation and operation of the pension fund, and to provide for the payment of pensions therefrom in full for the life of the pensioners, and that it had no lawful right to discontinue its business and stop the contributions to the fund without providing a fund, estimated at $7,000,000, for the payment of such pensions.

Nothing in support of this extraordinary contention can be found in the express terms of the contract, nor in the nature of the contract itself. The principle relied on to sustain the alleged implication is stated in 2 Parsons on Contracts (7th Ed.) p. 46, as follows: "The general ground of a legal implication is that the parties to the contract would have expressed that which the law implies had they thought of it or had they not supposed it was not necessary to speak of it because the law provided for it." The principle is applicable where the contract violated contains an express agreement to do what cannot be performed if the party omits to do what is necessarily implied for performance. The principle is conceded. But the cases cited by appellants as illustrative of the principle relate mostly to contracts involving an element of time within which a party agrees to do a certain thing, and where before the expiration of the time he deliberately or wrongfully incapacitates himself from performance. There is no analogy in such a situation to the contract at bar. Morris & Company did not incapacitate itself from performing anything it undertook to do. The last payment required to fulfil its obligation to contribute to the fund was made in 1914. All contributions thereafter were to be made by the

employees, and the committee was left in exclusive charge of the fund and the duty of administering it free from any control of Morris & Company and of any further obligation on its part with respect to it.

The only language pointed out in the rules upon which the fund was established to sustain a different construction is found in Rule VII, which reads:

"An officer or employee who has been twenty consecutive years in the service, on attaining the age of fifty-five years, shall be entitled to a Pension for life on retiring from service." Appellants place special emphasis on the words "for life." But Rule XXXI was manifestly intended to negative any inference or implication of any other obligations of the company towards the maintenance of the fund or liability therefor than those it expressly stipulated to as aforesaid. That rule reads:

"No pensioner, even after payment shall have been so approved and ordered, shall be entitled to have any part of the capital or income of the Company set aside to provide for the same. All sums of money shall be paid out of the Pension Fund."

This rule clearly imports that those retiring on a pension must look solely to the fund as raised and provided for in the rules, and refutes the theory of a lien on the assets of the company in the hands of the purchaser or otherwise. To hold there was such an implication would be not only to import into the agreement a provision the parties deliberately omitted therefrom, but one repugnant to other express provisions thereof.

These words "for life" in Rule VII must be regarded as assuming the continuance of the pension fund in the manner provided for by the rules, and not as obligating the company to continue it. In *Lead Co's Workmen's Funds Society, In re Lowes Governor & Company for Smelting Down Lead with Pit and Sea Coal*, 73 Chan. Div. L. J. R. 628; 20 L. T. R. 504,

a somewhat similar rule required construction. The society was formed to provide benefits for workmen out of its funds raised by fees and contributions from each member until he had attained the age of 65. The employing company ceased to carry on business, necessarily resulting in a cessation of such contributions and no employees to make them. The suit was brought to have the society dissolved and its funds distributed. One of the rules provided that a member of the society, upon attaining the age of 65 years, who had ceased to contribute to the society would become "indefeasibly entitled to a weekly allowance of six shillings for the remainder of his life." The court held in effect that these words did not mean that the beneficiaries were indefeasibly entitled to the weekly allowance whether the funds in the society were sufficient or not, but that the rule assumed that the society would have sufficient funds.

It is apparent that the continuance of the Morris & Company Pension Fund would depend upon the continuance of its business, and if appellants' contention is correct it involved either an obligation to continue it regardless of all other considerations, financial or otherwise, or on the sale of its property the establishment of a fund out of its assets sufficient—if it be solvent—to pay pensions, at the prescribed rate, to the 400 or more employees then on pension or entitled thereto for their entire lives. The amount estimated by appellants for that purpose is $7,000,000. That the agreement contemplated any such obligations, or restriction upon the company's right to dispose of its property, is not within the bounds of reason. It is safe to say that no industrial concern could safely, or would knowingly, enter into such an obligation, and if it could be implied from the nature or character of such an agreement the risks entailed would serve to prevent industrial concerns from establishing or participating in, and thus defeat, such benevolent enter-

prises.  There is neither law nor precedent for the contention.  There is nothing in the contract which imposes any limitation upon the right of the company to discontinue its business.  The exercise of that right necessarily involved a dismissal of its employees and stoppage of their contributions to the fund.  Upon their dismissal they were entitled under the rules to a withdrawal of what they had contributed, with interest.  Whatever effect this situation had on the balance of the fund it followed as an incident to the contract.

Much stress is laid by appellants on an amendment to the original Rule XXVIII which provided that the acceptance of a pension would not debar a retired officer or employee from engaging in any other business which in the judgment of the committee was not prejudicial to the interests of the company.  In 1917, under conditions growing out of the World War, the rule was changed to read:  "No Pensioner shall accept any employment without permission from the Pension Fund Committee, and Morris & Company shall at all times have first call on the services of a retired employee."  The propriety of this rule, or whether it was within the spirit of the contract, or whether it operated to the disadvantage of any employee, or whether it was justified by the World War conditions, is aside from its bearing upon the obligation of the company to provide for the continuance of the fund.  While the evidence as to the operation of the rule discloses no particular hardships resulting therefrom, it is manifest that when the company ceased doing business the rule ceased to have any operation.  In fact on the sale of the business, the committee declared the rule was no longer in force.  Whether or not the rule may be said to have established new contractual relations not contemplated in the original rules or not within the power of amendment, yet there is nothing in the rule or the relationship thus estab-

lished which effected any change of contract so far as the obligation of the company to continue the fund is concerned.

While it has no direct bearing on the merits of the controversy, it may be mentioned, in mitigation of alleged injustice from discontinuance of the business, that, as a whole, the pensioners have lost nothing from the arrangement, but have drawn out something like 13 times as much money as they contributed to the fund. They contributed $131,968.79, and have been paid out of the fund $1,652,850.58. The original 20 complainants paid into the fund $8,378.28 and drew out $85,522.99. Perhaps others now on pension have not realized proportionate benefits. If so, it was a risk incident to the contract.

Another argument advanced in support of the obligations to continue the business or the fund is that the pension constitutes a "deferred wage." There might be room for such a theory if there was consideration for a pension based on a reduced wage. But Morris & Company paid the standard wage for similar labor. While no doubt the expectation of a pension on the stated conditions furnished an inducement to enter the company's employ, contributions to the fund from the employee's wages was, under the rule, a condition of his employment after a period of six months. But the company did not obligate itself to continue it or the fund. In other words, his contribution rested entirely upon the express terms of the contract and not upon outside or implied considerations.

We deem it unnecessary to follow appellants' argument upon the features of different pension systems, public and private, and the distinctions made between rewards, bonuses, gratuities, deferred wages, etc. Lengthy quotations are made from dissertations of students of pension systems, and from reports of commissions and other bodies dealing with them, which, of course, have not the sanction of legal deci-

sions, but no pertinent legal authorities are cited that warrant interpretation of the contract as imposing an obligation to pay pensions as a "deferred wage."

We must, therefore, hold that the rules and regulations under which the fund was established and administered constitute a complete contract, free from ambiguity or implication of any omitted provision contemplated by the parties as essential to its fulfillment, and that Morris & Company performed its part of the contract and is in nowise guilty of a breach thereof.

This construction of the contract obviates the necessity of discussing other contentions more or less dependent upon the existence of such a breach. If the contract was not breached by the sale of the physical assets of Morris & Company, and the discontinuance of its business without a provision for future maintenance of the trust fund, then the purchaser took the property without any lien or obligation growing out of the contract. Authorities are unnecessary for the proposition that a party is free to dispose of his property, or acquire that of others on such terms or conditions as he sees fit, provided they do not conflict with any rule of law or good morals or public policy. (*Parker-Washington Co. v. City of Chicago,* 267 Ill. 136.) There is nothing in the proof to substantiate the claim of any wrongful or unwarranted methods on the part of Armour & Company or its officers, or the actual purchaser to induce the sale. The arrangements proven whereby the employees of Morris & Company were in effect on employment by Armour & Company to turn their withdrawals from the Morris & Company Pension Fund into the Armour & Company Pension Fund were within the legitimate scope of the right of contract.

Whatever motives actuated Morris & Company to sell, its rights being in no way hampered or limited by an obligation to continue the pension fund, and its discharged employees being entitled on dismissal to

withdraw their contributions thereto and consequently free to deal with the sum refunded to them as their own personal property and to contract with reference thereto and on such terms of other employment as they saw fit, it cannot be said, in the absence of any proof of fraud—and none is shown—that the arrangements made by Armour & Company with said employees constituted a conspiracy against or an intrusion upon any right complainants had to the fund. They had no right to the fund superior to that of the other contributors. (29 Cyc. 38.) The contract right to withdraw contributions under the conditions fixed by the rules and regulations was as sacred as the right to pension benefits under other conditions. The right to a pension was merely inchoate until the happening of the contingency on which it was allowed and paid *(McNevin. v. Solvay Process Co.,* 32 App. Div. 610, 53 N. Y. S. 98; 167 N. Y. 530), and even then subject to the contract right of each employee contributing to the fund to withdraw his contribution on resignation or dismissal.

We think it clear that under the rules and regulations those retiring on a pension could look only to the fund left after the exercise of the right to such withdrawals. The status of complainants, therefore, not being that of creditors of Morris & Company, their various theories of right to discovery by inquiry into the details and terms of the contract of sale, and of a lien on, or right to follow into the hands of the purchaser, the transferred property of said company, and of a violation of the Bulk Sales Law [Cahill's St. ch. 121a, ¶¶ 1-3], must each and all fall for want of a proper basis in law or equity.

The claim of vested rights has been frequently urged where allowances of mutual or benevolent societies for sick benefits have been lessened by subsequent authorized amendments to the society's by-laws by which the members were bound. *(Stohr v. San*

*Francisco Musical Fund Society,* 82 Cal. 557; *Smith v. Galloway* [1898], 1 Q. B. 71; *Supreme Lodge, Knights of Pythias v. Knight,* 117 Ind. 489; *Fugure v. Mutual Soc. of St. Joseph,* 46 Vt. 362; *Poultney v. Bachman,* 31 Hun [N. Y.] 49; *Pain v. Société St. Jean Baptiste,* 172 Mass. 319; *Marchant v. Lee Conservancy Board,* L. R. 9 Exch. [Eng.] 60, 30 L. R. Rep. 367; *Steen v. Modern Woodmen of America,* 218 Ill. App. 152; *Supreme Council Royal Arcanum v. McKnight,* 238 Ill. 349.) The tenor of the decisions in these cases is that it is a question of construction of contract. In effect they hold that reservations for amendments of by-laws effecting such changes, being a matter of contract, beneficiaries under the fund provided for were bound thereby and could not urge impairment of a vested right, their rights being only such as the contract in each case created. Here the rights of the pensioners being subject to the contract right of each employee contributing to the fund to withdraw his contribution on resignation or dismissal, the exercise of that right would necessarily decrease the fund, and to that extent diminish the prospect of future benefits to pensioners. In the very nature of things the status of the fund was subject to fluctuating conditions resultant upon withdrawal, whether gradual by resignation or dismissal, or from a discontinuance of the business and consequent termination of further contributions to the fund. In view of these provisions of the contract and the contingencies it contemplated there is no room for the contention of a vested right of the pensioners in the fund so returned, or of liability of the committee in so refunding. The committee would have violated its trust had it refused to refund to the discharged employees in conformity with its express terms. That the pensioners had a vested right in the balance of the fund is not questioned.

The theory that the committee was an agent of the company is also untenable. While they may have been amenable to and have acted upon suggestions from the company or its officers in amending the rules or otherwise, their powers in all respects were independent of any control or direction by the company, and there is no evidence tending to show that they exceeded their powers or violated their trust, or were parties to any conspiracy to interfere with any rights complainants possessed.

As before stated, this suit was begun by 20 of the pensioners as a class suit. It appearing that other pensioners under the fund, whose relations to the questions raised by the bill are the same, had employed in the matter the same solicitors as the original complainants, the court, on defendants' motion, required complainants to make them parties to the record. Complainants excepted to the order but made 145 other pensioners, in like situation as appears from the bill, as amended, additional parties complainant. It can hardly be questioned that had the latter not come in as cocomplainants, they might, by reason of their interests, have been made parties defendant. They seemed to have joined as complainants without protest. The question arises on the exception of the original complainants. But it is purely academic. Regardless of the propriety of the order we fail to see that any of the parties were injured by pursuing jointly interests common to all. The change of parties did not change the theory of the action or any rights of the original complainants thereunder.

The decree dismissing the bill for want of equity is affirmed.

*Affirmed.*

GRIDLEY, P. J., and FITCH, J., concur.